## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION


BROUGHTON HOWARD,

      Petitioner,

vs.

                          CASE NO. 3:07cv436-LAC/WCS

WALTER A. McNEIL,[1]

      Respondent.

_____/


## REPORT AND RECOMMENDATION

      This is an amended petition for writ of habeas corpus filed by Broughton Howard

pursuant to 28 U.S.C. § 2254.  Doc. 1.  Petitioner challenges his conviction for capital

sexual battery upon a person less than 12 years of age in the Circuit Court of the First

Judicial Circuit, in and for Okaloosa County, Florida, case number 02-1545 CFA.

Respondent filed an answer and the record in paper form.  Doc. 12.  References herein

---

[1] Walter A. McNeil succeeded James McDonough as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  FED. R. CIV. P. 25(d).

to exhibits are to the exhibits filed with the answer.  Petitioner filed a traverse, doc. 20.

Respondent acknowledges that the petition was timely filed.  Doc. 12, p. 2.

**Section 2254 Standard of Review**

"An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the

courts of the State."  28 U.S.C. § 2254(b)(2).[2]  But habeas corpus relief may be granted

only if Petitioner has properly exhausted his federal claims in state court.  § 2254(b)(1)

and (c).  To do so the federal claim be fairly presented to the state court, to give the

State the opportunity to pass upon and correct alleged violations of federal rights.  *See*

Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004)

(citations omitted); Duncan v. Henry, 513 U.S. 364, 365-366, 115 S.Ct. 887, 888, 130

L.Ed.2d 865 (1995).  While it is not necessary that the petitioner cite "book and verse" of

the Constitution, the state court must be alerted to the fact that a federal constitutional

claim is raised.  Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations omitted); *see*

*also* McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding that a petitioner

must "do more than scatter some makeshift needles in the haystack of the state court

record") (citations omitted).

The petitioner also "must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established

appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728,

---

[2] If no constitutional claims are raised, then §2254 is inapplicable and the
exhaustion inquiry is irrelevant.  Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct.
1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying this one complete round requirement to state collateral review process as well as direct appeal).  If a claim is not fairly presented through one complete round of state court review and review is no longer available in state court, it is procedurally defaulted and the petitioner must demonstrate cause and prejudice for the default *or* a miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).[3]

For claims that were properly exhausted and adjudicated in state court, this court's review is limited.  "[A] determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).  Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(2); 321 F.3d at 1322 (citing the statute).  Section 2254(d)(2) is satisfied "only if it is shown by clear and convincing evidence that the state court's

---

[3] The miscarriage of justice exception applies only to extraordinary cases, where a constitutional violation has probably resulted in conviction of an innocent person. McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991). *See also* House v. Bell, 547 U.S. 518, 536-537, 126 S.Ct. 2064, 2076-2077, 165 L.Ed.2d 1 (2006) (explaining what must be shown to demonstrate actual innocence as a "gateway" to review of a defaulted claim).

presumptively correct factual findings do not enjoy support in the record." Lomholt v.
Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state
court's adjudication of the merits of the federal claim "resulted in a decision that was
contrary to, or involved an unreasonable application of, clearly established Federal law,
as determined by the Supreme Court of the United States." § 2254(d)(1).  "[C]learly
established Federal law, as determined by the Supreme Court of the United States,"
refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower
federal courts may be considered to the extent that they demonstrate how those courts
applied Supreme Court holdings.  Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir.
2003) (citations omitted) ("The decisions of other federal circuit courts (and our
decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the
decisions demonstrate that the Supreme Court's pre-existing, clearly established law
compelled the circuit courts (and by implication would compel a state court) to decide in
a definite way the case before them.").  *See also*, Carey v. Musladin, 549 U.S. 70, 74-
77, 127 S.Ct. 649, 653-654, 166 L.Ed.2d 482 (2006) (§ 2254 refers to holdings, rather
than *dicta*, of the Supreme Court, collecting cases to show that "[r]eflecting the lack of
guidance from this Court, lower courts have diverged widely in their treatment of
defendants' claims.").

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have
independent meanings.  Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495,
1519-1520, 146  L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843,
1850, 152 L.Ed.2d 914 (2002) (citing Williams).

> Under the "contrary to" clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by [the
> Supreme] Court on a question of law or if a state court decides a case
> differently than this Court has on a set of materially indistinguishable facts.
> Under the "unreasonable application" clause, a federal habeas court may
> grant the writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct.

at 1850.  *See also*, Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858-2859, 168

L.Ed.2d 662 (2007) (discussing the unreasonable application standard) (citing Williams,

other citations omitted).

"Avoiding these pitfalls [described in Williams v. Taylor] does not require citation

of our cases – indeed, it does not even require *awareness* of our cases, so long as

neither the reasoning nor the result of the state-court decision contradicts them."   Early

v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in

original).  Further, "whether a state court's decision was unreasonable must be

assessed in light of the record the court had before it."   Holland v. Jackson, 542 U.S.

649, 652, 124 S.Ct. 2736, 2738, 159  L.Ed.2d 683 (2004).

The basic law governing ineffective assistance of counsel claims was clearly

established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,

2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520;

Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland,

Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or

omissions of counsel that are alleged not to have been the result of reasonable

professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim,

"counsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment."  466 U.S. at

690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a

petitioner to show that the conduct was unreasonable, a petitioner must establish that

no competent counsel would have taken the action that his counsel did take."  Chandler

v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), cert. denied, 531 U.S.

1204 (2001).  See also Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing

Chandler).  There are no rigid requirements or absolute duty to investigate a particular

defense.  Fugate v. Head, 261 F.3d at 1217.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always
> better.  Stacking defenses can hurt a case.  Good advocacy requires
> 'winnowing out' some arguments, witnesses, evidence, and so on, to
> stress others."

Id.

For prejudice, Petitioner must show "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the

outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

A state court's adjudication of an ineffective assistance claim does not satisfy the

"contrary to" language of § 2254(d)(1) even if this court might have applied Strickland

differently.  Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122

S.Ct. at 1852.  To determine whether the state court's adjudication was an

"unreasonable application" of Strickland, Petitioner "must do more than show that he

would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Trial Evidence**

The child victim, Petitioner's grandson, was seven years old.  Ex. D (initial *Anders* brief on appeal), p. 3.  He was found by the trial court to be competent to testify.  *Id.*  He testified that he was staying with his grandfather, Petitioner, at the Dolphin Hotel.  *Id.*  The child said that Petitioner pulled down his pants and placed his (the child's) penis into his (Petitioner's) mouth.  *Id.*  At that moment, Shanna Davis, a friend of the child's mother, opened the door, walked in, and witnessed the offense.  *Id.*  Petitioner told Davis that she "didn't see anything," but she told him she did.  *Id.*  The next day at the police station, the child said he stilled loved his grandfather, but did not like what he did.  *Id.*  Shanna Davis testified as to what she saw.  *Id.*, pp. 3-4.  Davis called the police after she left the hotel room.  *Id.*, p. 4.  Davis had twice been convicted of crimes involving dishonesty.  *Id.*

After arrest, Petitioner was interviewed.  *Id.*, p. 6.  Petitioner admitted that Davis had entered his room without knocking and said, "What are you doing to that baby?"  *Id.*  Petitioner said he was just sitting on the child's bed, doing nothing.  *Id.*  Detective Pond, who was interrogating Petitioner, told Petitioner that he had seen and heard the interview of the child at the Child Advocacy Center, and the child had confirmed what

Davis had said, that Petitioner had placed the child's penis into his mouth. *Id.* When asked whether the child was lying, Petitioner began to cry and shook his head from one side to the other. *Id.* When asked if the child was telling the truth, Petitioner nodded affirmatively. *Id.* When asked if there were any other victims "out there," Petitioner said, "No. There is no others." *Id.*

Petitioner testified that Davis had come into his room without knocking and accused him of molesting the child. *Id.*, p. 8. He said he did not know he was signing a *Miranda* waiver of rights during the interrogation. *Id.* He denied that he sexually assaulted his grandson. *Id.*, pp. 8-9.

**Ground One**

Petitioner asserts that his trial attorney was ineffective for failing to investigate and obtain evidence that the child victim "made relevant and material false accusations against other men." Doc. 1, p. 4; p. 6 on the electronic docket (ECF). Petitioner argues that when the prosecutor filed a motion in limine pursuant to FLA. STAT. §§ 90.609 and 90.610 to prohibit Petitioner from "commenting . . . that the victim has told lies," his attorney was unprepared "to proffer evidence that the child/victim had lied" and unable to argue that such evidence is admissible pursuant to Jaggers v. State, 536 So. 2d 321 (Fla. 2d DCA 1988).[4] *Id.*, p. 4-A; p. 7 on ECF.

---

[4] In Jaggers, an important child witness against a defendant charged with sexual assault upon three children had previously accused her own father of sexual assault and had later admitted the falsity of the charge; the State agreed that this was true. 536 So. 2d at 327. The court held that it was reversible error to forbid cross examination of this witness about the prior false accusation. *Id.*

The critical aspect of this claim is whether Petitioner actually had evidence that the child victim had made false accusations in the past, and even if he did, whether such evidence, if presented, would probably have changed the outcome.  Petitioner presented this claim in his Rule 3.850 motion and the trial court held an evidentiary hearing.  The trial court denied the claim, making the following findings of fact and conclusions of law:

> In the first claim for relief,[1] the Defendant alleges that his trial attorney, Scott Tatum, erred by failing to investigate information that the victim had made prior false accusations of sexual abuse against other individuals.  At the evidentiary hearing, the defendant said that the victim had made false allegations of sexual abuse against two men, identified only as "Larry" and "Steve."  The Defendant said that the two men lived in Wilmington, Ohio.  According to the Defendant, there is a police report from Ohio which would verify that the victim had made false claims of sexual abuse.  *The police report was not presented at the evidentiary hearing.*
>
> The Court finds that trial counsel cannot be held ineffective for failing to investigate prior false claims made by the victim in this case.  First, the Court notes that *Mr. Tatum testified that he did, in fact, make reasonable, albeit unsuccessful, efforts to investigate whether the victim had made false allegations in the past.  Secondly, the Court finds that there is no competent evidence that a report of the false allegations even exists.*  Trial counsel, therefore, cannot be held ineffective for failing to discover evidence of prior false allegations which have never been substantiated.  Furthermore, even if the Defendant could substantiate that the victim in this case had previously made false allegations against other individuals, this Court would still deny relief.
>
> According to the arrest report, *Shanna Davis walked in on the Defendant performing oral sex on the victim.  Later, Ms. Davis testified in front of a jury about what she had witnessed.*  The accusations, therefore, were not based solely on the credibility of the victim.  In light of the eye witness testimony of Ms. Davis and the incriminating comments from the Defendant to Detective Pond, the Court finds that even if there were false allegations of record, the Defendant would not be entitled to relief based on ineffective assistance of counsel since no prejudice can be shown.
>
> [1] Grounds II-III, V, VII-IX were summarily denied by this Court in an order Dated December 12, 2005.

Ex. K, R. 362-363 (emphasis added).

These findings of fact are presumed to be correct.  28 U.S.C. § 2254(e)(1).

Petitioner has not rebutted them with clear and convincing evidence.  Petitioner has

come forward with no evidence to prove that the child victim made false accusations of

sexual abuse in the past.  Petitioner has not come forward with this alleged police

report.  Indeed, he should have produced the police report at the Rule 3.850 evidentiary

hearing.  He may not do so now.[5]  The conclusion that there was no competent

evidence that the victim had made false accusations of sexual abuse in the past has not

been rebutted.

Moreover, there is still the evidence from the eye witness account, the consistent

testimony of the child,[6] and Petitioner's own admissions.  Hence, the trial court's

conclusion that there was no attorney error or prejudice to the outcome has not

"resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United

States."  § 2254(d)(1).

---

[5] In state court, "the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met."  (Michael) Williams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435 (2000).  Those "stringent requirements" are not implicated here.  See § 2254(e)(2)(A)(i) and (ii) (requiring, as a preliminary matter, that the claim be based either on a new rule of law, or on facts not previously discoverable by due diligence).

[6] In contrast, in the Jaggers case, the child victims had made previous inconsistent statements.  536 So. 2d at 324.

**Ground Two**

Petitioner contends that his attorney was ineffective for failing to challenge the child's competency to testify.  Doc. 1, p. 4; p. 6 on ECF.  Petitioner concedes that the victim knew the difference between the truth and a lie, but argues that the prosecution did not establish that the victim "had a moral obligation or sense of duty to tell the truth." *Id.*, p. 4-C; p. 9 on ECF.  He contends that the trial court never made any finding as to this aspect of the competency of the child to testify.  *Id.*  Petitioner also contends that there was insufficient evidence to show that the child could accurately recall past events as distinguished from recent events.  *Id.*, p. 4-D; p. 10 on ECF.

The Rule 3.850 court denied this claim without a hearing.  Ex. K, R. 207.  The court noted that Petitioner's lawyer did in fact object and a competency hearing was held.  *Id.*  The court further noted that it had "ultimately found that the witness was qualified to offer testimony and that he understood the difference between right and wrong." *Id.*

These findings are firmly supported by the record.  Petitioner's attorney objected to testimony from the victim.  Ex. A (trial transcript), p. 96.  A hearing was held outside the presence of the jury.  *Id.*, p. 97.  The child was seven years old at the time of the testimony.  *Id.*  He knew his birthdate, the name of his school, the city, his teacher, his favorite subject, and said he was making A's and Bs.  *Id.*, pp. 97-98.  He said he could read and could count to "about a thousand."  *Id.*, p. 97.  He knew his street address. *Id.*, pp. 98-99.  He was then living with foster parents.  *Id.*, p. 99.  He knew the time of his favorite television program.  *Id.*  When asked what happens if he told a lie, he said: "I get in trouble" and would "lose my TV and my Game Boy."  *Id.*, p. 100.  He said that

because he had on a white shirt, it would be a lie for the prosecutor to say that he had

on a red shirt. *Id.* When asked whether he understood that it was important to tell the

truth "today," he said "yes." *Id.*, pp. 100-101.  When asked if he "can assure the Judge

that you'll do that," tell the truth, he said "yes." *Id.*  On cross examination, he said that

he understood that he was to tell everyone what happened, but he was "kind of

embarrassed though." *Id.*, p. 101.  On redirect, the child said he was going to tell the

truth and he promised to do that. *Id.*, p. 102.  He was the examined by the court.  He

told the court that his parents drove a gray car, he had toast and milk for breakfast, and

he had vegetables, rice and meat for supper the night before. *Id.*, pp. 102-103.  He said

that Petitioner, whom he called Grandpa Howard, had had a girlfriend but she had

moved out. *Id.*, pp. 104-105.  He could not remember her name. *Id.*, p. 105.  On

recross, he said that the prosecutor had told him to tell the truth today. *Id.*  Based upon

this evidence, the court found that the child had sufficient maturity, memory, vocabulary,

and intelligence to understand right from wrong and to recollect any events of which he

might be questioned. *Id.*, p. 107.

Florida law provides that a child witness must be found to have "a moral sense of

the obligation to tell the truth." In re G.S., 989 So. 2d 1282, 1283 (Fla. 2d DCA 2008).[7]

_____

[7] The court noted:

Section 90.605(2), Florida Statutes (2006), provides that, as a matter of
trial court discretion, "a child may testify without taking the oath if the court
determines the child understands the duty to tell the truth or the duty not to
lie."  In determining whether a child is competent to testify, "the trial court
should consider (1) whether the child is capable of observing and
recollecting facts, (2) whether the child is capable of narrating those facts
to the court or to a jury, and (3) whether the child has a moral sense of the
obligation to tell the truth." *Griffin v. State*, 526 So. 2d 752, 753 (Fla. 1st

"Questioning that demonstrates a child knows the difference between the truth and a lie does not necessarily establish that a child has 'a moral obligation to tell the truth.' " *Id.*, at 1284.  The court remanded for an evidentiary hearing as to competency since the child, a seven year old, was not questioned about her understanding of her moral sense of duty to tell the truth, her testimony was characterized as having a "fantastic nature," and there was no corroborating evidence.  *Id.*  The court cited Bennett v. State, 971 So. 2d 196 (Fla. 1st DCA 2007) as a case which properly reached a different conclusion because there, other evidence corroborated the child's testimony, and the child "could separate fact from fantasy and knew it was bad to lie."  *Id.*

As the court in Bennett v. State pointed out:  "The competence of a child witness is based on intelligence, not age, and whether the child possesses a sense of the obligation to tell the truth."  971 So. 2d at 201.  The court found the child to be competent, reasoning:

> Unlike the situation in *Black*,[8] the court here extensively questioned
> N.D.D.  N.D.D. demonstrated her intelligence, accurately recounting facts
> about her life, including Christmas presents received and school, unlike

---

> DCA 1988) (*citing Lloyd v. State*, 524 So. 396, 400 (Fla.1988)); *see
> also Z.P. v. State*, 651 So. 2d 213, 213-14 (Fla. 2d DCA 1995) ("When a
> child's competency is at issue, the court must determine whether the child
> is capable of observing, recollecting, and narrating facts in addition to
> whether the child has a moral sense of the duty to tell the truth.").  A trial
> court's determination of whether a child "has sufficient mental capacity
> and sense of moral obligation to be competent as a witness" is subject to
> an abuse of discretion standard of review.  *Lloyd*, 524 So.2d at 400.

989 So. 2d at 1283.

[8] Black v. State, 864 So. 2d 464 (Fla. 1st DCA 2003).

the child in *Seccia*[9].  *Significant corroboration* of N.D.D.'s testimony exists: most importantly, *Appellant's admission that he touched N.D.D.'s vagina*; the family friend's testimony regarding N.D.D.'s physical condition when she picked N.D.D. up from Appellant's home; the Child Protection Team case coordinator's testimony; and Appellant's cousin's testimony. This corroboration significantly distinguishes the situation here from that in *Griffin*.  Additionally, N.D.D. was capable of separating fact from fantasy and knew it was bad to tell a lie, unlike the child witness in *Griffin* [*supra*, note 5].

\*                    \*                    \*

Similarly, N.D.D. met the requirements for testifying in court.  She was capable of observing and recollecting facts and narrating those facts to the court, as she testified about school, her Christmas gifts, her birthday and age.  Further, as the trial court recognized, *she possessed a moral sense of the obligation to tell the truth because she knew it was wrong to lie, thought something bad would happen if she lied, and promised not to lie.*

971 So. 2d at 201-202 (emphasis added).

The case at bar is almost exactly like <u>Bennett v. State</u>.  The child here testified that he knew it was wrong to lie, thought something bad would happen if he lied, and promised not to lie.  Thus, all of the elements under Florida law for finding that he had a "moral sense of the obligation to tell the truth" were in place.  Further, he testified at length about his personal history, showing no inability to recall, understand, or to articulate his memories.  His testimony was corroborated by Petitioner's admission and by an eye witness account of what happened.  Neither attorney error nor prejudice to the outcome has been shown.  The trial court's disposition of this claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

---

[9] <u>Seccia v. State</u>, 689 So. 2d 354 (Fla. 1st DCA 1997).

**Ground Three**

Petitioner claims that his attorney was ineffective when he failed to object to the testimony of Detective Curtis A. Pond, who had observed an interview with the victim through a two-way mirror, and testified that he told Petitioner that he believed that the victim was telling the truth.  Doc. 1, p. 5, 5-A; pp. 12-13 on ECF.  Detective Pond made these statements as he was interrogating Petitioner in custody.  *Id.*, p. 5-A; p. 13 on ECF.  Detective Gene Holland also testified, repeating what Pond had said during the interrogation of Petitioner.  *Id.*, pp. 5-A and 5-B; pp. 13-14 on ECF.

Petitioner claims that while the prosecution asserted that this evidence was admitted simply to explain the context of Petitioner's admissions during interrogation, the result was more prejudicial than probative because it independently suggested to the jury that the victim was telling the truth.  Petitioner argues the error was not harmless because the eye witness, Davis, was unreliable as she had twice been convicted of crimes involving dishonesty, and that, therefore, the credibility of the victim was very important.  *Id.*, p. 5-B and 5-C; pp. 14-15 on ECF.

The context of this claim is the following.  Detective Pond testified that Petitioner had been asked during the interrogation whether his daughter's friend had come to the motel, and he said yes.  Ex. A, p. 163.  He said he could not recall the statement she had made when she entered the room.  *Id.*  Detective Pond told Petitioner that she had said, "what are you doing to that baby," when she entered the room, and he admitted she had said that, but denied that he was doing anything.  *Id.*, p. 164.  He admitted she had walked in without knocking, and he was upset by that.  *Id.*, p. 165.  The Detective then explained that he could see that this line of questioning "wasn't going much

anywhere," so he switched to explaining the "CAC" (Child's Advocacy Center) process
and what the victim "had done earlier that day while he was at work." *Id.* , p. 164.  He
explained that he had observed "his grandson with another professional," and his
grandson "was very smart for his age, had a wide vocabulary, and was able to put detail
and articulation into his thought process, that I was impressed by the way that his
grandson could reveal the facts and that he was, in fact, very believable." *Id.*, p. 166.
Pond then told Petitioner what his grandson had said, and Pond said that Petitioner
"was starting to lower his shoulders, his hands were starting to open up." *Id.*  Pond felt
that the "honesty of his grandson" was "having an impact" so he continued the line of
questioning.  *Id.*  Pond then asked Petitioner if his grandson was lying when he said that
Petitioner took his grandson's penis into his mouth, and Petitioner "started to cry, and
he started moving his head left to right as he was crying . . . ." *Id.*, pp. 166-167.  Pond
pursued the issue, telling Petitioner that he knew his grandson was not lying (as
Petitioner had indicated with his head nod), and he changed his head movement to up
and down.  *Id.*, p. 167.  Pond then asked if there were any other victims, and Petitioner
said:  "No there is [sic] no others."  *Id.*, p. 168.  Petitioner also told Pond, "I can't tell you
I did this, I will lose everything," and he asked "how much time will I get for this." *Id.*, p.
168.

The trial court denied this claim without a hearing.  The court acknowledged that
Florida law prohibits a witness from vouching for the credibility of the victim.  Ex. K, R.
207, citing Tingle v. State, 536 So. 2d 202 (Fla. 1988), but found Tingle to be
inapplicable.  The court reasoned that the testimony was not admitted to bolster the
victim's credibility, but

was simply the detective's account of the interrogation he conducted with
the Defendant and how he was able to successfully obtain an admission
by insisting to the Defendant that the victim was telling the truth.  In
response to hearing the detective say that the Defendant's grandson was
being truthful, the Defendant allegedly became very emotional and
appeared to confirm the accusation.  It was only in the context of
explaining how the confession was obtained that the detective said he
believe the victim was telling the truth.  Since the testimony was
admissible evidence of the Defendant's guilt, any objection made by
defense counsel would have been overruled.

*Id.* Ex. K, R. 208.

As the state court found, the critical admissions were simple nods of the head.

These demonstrative nonverbal responses would have been meaningless without

complete evidence as to the questions and statements made by Pond which prompted

them.  Also, the jury would reasonably have understood that the statements by Pond

were, as he testified, in pursuit of an interview technique, and were not intended to

prove that the victim was credible.  The court said it would have overruled any objection

that might have been made, so it is implausible that there could have been attorney

error in failing to make an objection.  Consequently, Petitioner has not shown that the

trial court's ruling on this claim has "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Four**

Petitioner contends that he was interrogated after he had requested assistance

from a lawyer.  Doc. 1, p. 5-D; p. 16 on ECF.  He alleges that he asked Detective Pond

to "get Don Dewrell down here."  *Id.*  He said that Pond laughed, and told him that it was

not in his job description to assign a lawyer to him.  *Id.*  Petitioner alleges that Pond told

him that if he waited to get a lawyer, his opportunity to give a version of events that would be believed "would be closed." *Id.* Petitioner contends that his lawyer was ineffective for failing to file a motion to suppress his admissions on these grounds. *Id.*

The trial court held an evidentiary hearing as to this claim. The trial court noted that at the hearing, Petitioner testified that he asked Detective Pond for a lawyer prior to questioning and Pond denied that Petitioner had asked for a lawyer prior to the interrogation. Ex. K, R. 363. The court found this testimony not credible because Petitioner had signed a waiver of his *Miranda* rights and agreed to talk to Pond without a lawyer present. *Id.*, R. 363-364; *see* Ex. A, R. 38 (copy of the warning signed by Petitioner). The court concluded that a motion to suppress would have been denied, and therefore counsel could not have been ineffective for failing to file one. *Id.*, R. 364.

This claim is rather straight forward. After a full evidentiary hearing. Petitioner's version of events was not believed because he signed a waiver. Petitioner has not shown by clear and convincing evidence that this finding of fact was erroneous. Therefore, Petitioner has not shown that the trial court's adjudication of this claim has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Ground Five**

Petitioner claims that his attorney was ineffective for failing to impeach the testimony of eye witness Shanna Davis. Doc. 1, p. 6-A; p. 19 on ECF. Petitioner notes that the State filed a motion in limine before trial, seeking to exclude evidence that Davis was a prostitute and had previously engaged in commercial sexual activity with

Petitioner.  *Id.*  Petitioner states that his attorney told the trial court that he intended to

show that Davis had ill will toward Petitioner "because of a transaction between the

Defendant and Miss Davis that was less than satisfactory."  *Id.*  When the court asked

counsel if this meant that counsel intended to offer evidence that Davis had "dealings or

contracts with the Petitioner" as a prostitute, counsel said yes.  *Id.*  The trial court

granted the motion in limine.  *Id.*  Petitioner contends that his attorney was "grossly

unprepared" to show that Davis's activity as a prostitute was relevant to the case.  *Id.*, p.

6-B; p. 20 on ECF.  Petitioner asserts that he had had a sexual encounter with Davis

and did not pay her enough, and each time he saw her thereafter, "she would cry, beg,

and argue for **more** money, because her pimp was dissatisfied with the payments."  *Id.*

(emphasis by Petitioner).  Petitioner argues that his attorney failed to adequately

investigate this evidence.  *Id.*

   The trial court denied this claim without an evidentiary hearing.  Ex. K, R. 208.

The court noted the procedural history set forth above.  *Id.*  The court reasoned:

> Since defense counsel sought to raise the issue in question but was
> prevented from doing so by virtue of the Court's ruling, the issue was
> preserved for review.  As the issue could have been raised on direct
> appeal, defense counsel cannot be ineffective and the claim is denied.

*Id.*

   This ruling did not necessarily address the specific claim.  The claim was not that

counsel failed to raise the issue at all, but that counsel was ineffective in the way the

issue was litigated.  In his Rule 3.850 motion, Petitioner made the same claim as made

here, that when the trial court granted the motion in limine, "defense counsel was

grossly unprepared to proffer in opposition of limine that Shanna Davis'[s] illicit

occupation as a prostitute had anything to do with the case.  But, in fact, it did!"  Ex. J,

R. 37.  Petitioner alleged: "Davis was a prostitute that the Defendant had no intention of

fully compensating for poor performance, and she had to find a way to pay back her

pimp."  *Id.*, R. 38.[10]

The motion in limine sought to preclude evidence that the child victim had

previously made false accusations (addressed above) and that Davis was a prostitute

who had engaged in sexual acts with Petitioner.  Ex. A, R. 19.  At the hearing on this

motion, Petitioner's attorney's argument in its entirety is the following:

> The way I read the motion that [the prosecutor] provided to the Court is –
> would be questioning State's witness Shanna Davis regarding her
> prostitution and her arrangements with the defendant.  There would be
> testimony in that *showing an animus or bias on Miss Davis's part* because
> of a transaction between the defendant and Miss Davis that was less than
> satisfactory.  He couldn't get his money back.  We think that it's important
> to discuss this matter.

Ex. B, 68-69 (emphasis added).  No other argument was made, and the court granted

the motion, finding that the evidenced was only related to bad acts by Davis and was

not relevant.  *Id.*, p. 69.  The court did not mention the argument that this would show

the bias of Davis.

At trial, the last question that Petitioner's counsel asked on direct was whether

Davis had any "reason" to accuse Petitioner.  Ex. C, p. 233.  Petitioner said: "Not unless

she was just upset over what had happened about two months prior to that, you know,

---

[10]  He further alleged that his daughter, Krysta Howard, mother of the victim,
"promised that Davis would be paid if she would falsely complain to the police that she
came over and witnessed the Defendant perform oral sex on his grandson."  *Id.*, R. 38.
He points out that Davis said that an unnamed "friend" had driven her to his hotel room,
and he argues that this friend was the pimp who wanted his money.  *Id.*, R. 39.

when I gave her $40 for her to – " *Id.*  The objection, that the motion in limine had been granted, was sustained.  *Id.*, pp. 233-234.

In Florida, a witness may not be impeached by proof of specific bad acts other than felonies or misdemeanors involving dishonesty.  Fernandez v. State, 730 So. 2d 277, 282-283 (Fla. 1999), *citing*, FLA. STAT. §§ 90.608, 90.609, and 90.610.  But it can be reversible error to restrict a defendant's ability to cross examine a prosecution witness for bias.[11]  Brown v. State, 424 So. 2d 950, 955 (Fla. 1st DCA 1983).

> Normally, testimony which concerns the moral character and prior bad acts of a witness is not admissible to impeach a witness.  However, in this case, such testimony is admissible to show a possible bias or motive on the part of the victim in testifying that appellants had never been inside his residence.  Although the questions of whether the victim had ever sold marijuana or paid cash for food stamps or engaged in homosexual activity are not directly relevant or material to the question of whether appellants had ever been inside the victim's residence, testimony concerning these issues could possibly show a motive for the victim in denying that appellants had ever been inside his house.  This is especially true in light of the fact that both appellants testified that they were inside the victim's home prior to the crime for illegal purposes.

*Id.*  "It is settled in this court that, for the purpose of discrediting a witness, a wide range of cross-examination is permitted as a matter of right in regard to his motives, interest, or animus as connected with the cause or the parties thereto, [u]pon which matters he may be contradicted by other evidence . . . ."  Morrell v. State, 335 So. 2d 836, 838 (Fla. 1st DCA 1976), *disapproved on other grounds*, Edwards v. State, 548 So.2d 656 (Fla. Sep 07, 1989), *quoting,* Pittman v. State, 51 Fla. 94, 41 So. 385 (1906).  *See also*,

---

[11] The credibility of a witness may be attacked by proof that the witness has been convicted of a felony or a misdemeanor involving dishonesty or a false statement.  FLA. STAT. § 90.610(1).  However, § 90.610(3) provides that nothing in § 90.610 affects the admissibility of evidence under § 90.608.  The credibility of a witness may be attacked by "[s]howing that the witness is biased."  FLA. STAT. § 90.608(2).

Minus v. State, 901 So.2d 344, 348-350 (Fla. 4th DCA 2005) (evidence of a prior sexual relationship between defendant and the victim, and that the victim had made prior complaints of sexual assault, were admissible).

While counsel's argument against the motion in limine was short, it correctly stated the law.  Davis might have been impeached with evidence showing her bias. Further, the issue was sufficiently preserved that it could have been raised on direct appeal, with elaboration from case law.  But on the evidence in this record, this was a very weak strategy and there was little reason for an objectively reasonable attorney to pursue it more strenuously.

The record contains affidavits of Debra Howard and Petitioner's brother, Wallace Howard.[12]  Although the affidavits contain hearsay evidence that would have been inadmissible at trial in this form, the hearsay indicates the potential pitfalls had counsel pursued the issue of bias.

Debra Howard (who was married to Wallace Howard) avers that she had spoken to Krysta Howard,[13] who admitted to her that she (Krysta Howard) was using drugs.  Ex. A, R. 39-40.  Debra Howard states that Krysta Howard's son, the child victim, had been "taken from her" because she had left him with Petitioner.  *Id.*, R. 39.  Debra Howard said that Krista Howard told her that "*she had sent* a friend to the Dolphin Inn *for sexual*

---

[12] These two affidavits were marked by Petitioner as exhibits for trial, but not offered or admitted into evidence.  Ex. A, R. 37.  The trial court ruled that testimony from Debra Howard and Wallace Howard as witnesses would be "absolutely one hundred percent irrelevant."  Ex. B, p. 216.

[13] Debra and Wallace Howard spell the name Krista.  Petitioner, her father, spells it Krysta, and that spelling will be used.

*services* and found [Petitioner's] door ajar, pushed it open and found [Petitioner] with

[the child victim]."  *Id.*, R. 39-40 (emphasis added).

There is also the affidavit of Petitioner's brother, Wallace Howard.  *Id.*, R. 41.  He

avers that after Petitioner had been arrested, he and Debra Howard went to Petitioner's

room at the Dolphin Inn to gather up Petitioner's belongings.  *Id.*  He states that a

woman's purse was there, and inside was Krista Howard's identification card.  *Id.*  He

states that Krysta Howard said that she had sent her friend to her father (Petitioner) for

prostitution purposes.  *Id.*, R. 42.  Wallace Howard said he had "found Dream Weaver

Escort Services cards in Krista's purse."  *Id.*  Wallace Howard further avers that Krysta

Howard was only concerned about getting Petitioner's property.  *Id.*

Shanna Davis said in a deposition prior to trial that she had known Petitioner

about seven months before the incident, and had previously engaged in sexual activity

with him for $50.  Ex. J, R. 114-115.  She said he called her that night and asked her to

come over for "some drinks."  *Id.*, R. 115.  Krysta Howard[14] was supposed to have been

there, too.  *Id.*  She said that Petitioner only paid for her cab fare that night.  *Id.*, R. 116.

She said that she came in and said, "oh, my God, . . ., what are you doing to this baby,

and he looked at me and he said his mother wasn't but six years old when it happened

to her."  *Id.*, R. 116-117.  At trial, Davis did not testify to this latter statement.  Ex. B, pp.

128-129.  She said instead that after she exclaimed "oh, my God, what are you doing to

this baby," Petitioner said he was not doing anything, but he also told her that she had

"better not tell anybody and I didn't see anything."  *Id.*, p. 129.  She said that instead of

---

[14] The name is spelled Kristia in this deposition.  *Id.*

taking a cab, she got a friend to bring her over, who waited outside, and that Petitioner gave her money for the ride and she went outside and paid the friend.  *Id.*, pp. 123, 129. She said that she then stayed in the room for an hour or an hour and a half waiting for the victim's mother to come back.  *Id.*, p. 129.

In summary, an attempt to impeach Shanna Davis as argued would have served little useful purpose and could have been quite damaging to the defense.  It would have demonstrated that Petitioner had previously paid Davis for sex, and that would have cast Petitioner in a unfavorable light.  Had Davis been pressed on cross examination, she might have admitted that she was sent to his hotel room that night by Petitioner's own daughter, to engage in sex for money while Petitioner's grandson was present. This would have been very damaging for Petitioner.

Moreover, the amount of money was small.  Petitioner said he paid Davis $40 for sex on the earlier occasion and Davis said in her deposition that her fee had been $50. It is very doubtful that the jury would have concluded that Davis falsely accused Petitioner of capital sexual battery over a few dollars.

Consequently, attorney error, for failing to argue the issue more vigorously, has not been shown, nor has prejudice to the outcome.  Therefore, ground five affords no relief.

**Ground Six**

Petitioner contends his attorney was ineffective in failing to present evidence from three witnesses.  Plaintiff contends that saliva should have been recovered, and that saliva could have subjected to DNA testing.  Doc. 1, p. 6-C; p. 21 on ECF.  He contends that a witness should have presented evidence of the results.

He contends that the child victim said in a deposition that he experienced pain, as if he had been bitten.  Petitioner asserts that Dr. Lynn Keefe examined the victim, finding no bruising, marks, or scars, and she could have so testified.  *Id*.

Finally, Petitioner contends that his daughter, Krysta Howard, was engaged in a "conspiracy to have her father arrested," made her son watch and participate in sexual acts, and had falsely accused Petitioner before.  *Id*., p. 6-D; p. 22 on ECF.  He contends she should have been called as a witness.

The Rule 3.850 court found that no DNA testing occurred.  Ex. K, R. 364.  Thus, there was no witness who could have testified as to the results of DNA testing.  The court also found that Dr. Keefe said that she collected "physical evidence," but did not do DNA testing.  *Id*.  Petitioner's attorney testified that "he did not think a [DNA] test would have [benefitted] his client."  *Id*.  The court further noted that Dr. Keefe had said in her deposition that although the child "said he had experienced pain as if he had been bitten, she did not see any bite marks on the child's genitals."  *Id*.  The court found that Petitioner's lawyer "did not call Dr. Keefe to testify because he feared she might actually have substantiated the claims of abuse."  *Id*.  Counsel had testified that Dr. Keefe's examination was consistent with the history given her by the child, and he "wasn't going to put her up there just to attempt to impeach her or to get to things that

the state may have, in fact, forgotten about." *Id.*, R. 319.  The court concluded that the decision not to call Dr. Keefe was a sound strategic decision.  *Id.*, R. 365.

The trial court found that Petitioner's attorney testified that he "attempted on numerous occasions to locate [Krysta Howard], but was unsuccessful," and concluded that he could not be held ineffective for failing to locate her since she "was not available to testify." *Id.*, R. 365.  The court also found that there was no evidence that her testimony would have affected the outcome of the case.  *Id.*

Petitioner has not shown that these findings of fact were clearly erroneous, and the legal conclusions are sound.  Petitioner has not shown that had DNA testing been conducted, it would have helped his defense.  His defense was that he did not do anything wrong.  If that was true, there would have been no material to test for DNA.  But he made admissions to Detective Pond, and a DNA test could have confirmed that he was the offender.  Counsel's decision not to pursue DNA testing was a strategic decision and not attorney error.

Likewise, the decision not to call Dr. Keefe as a witness was a strategic decision, as the trial court found.  *Id.*, R. 365.  Further, the trial court found no prejudice to the outcome, that the "lack of physical evidence would have only been marginally relevant and certainly would not have [a]ffected the outcome of the case in light of the other evidence against the Defendant." *Id.*, R. 364-365.

Counsel cannot be faulted for failing to find Krysta Howard.  Indeed, even if he had, it is hard to imagine that she would have admitted the accusations that Petitioner lodges against her in this claim.  She might have testified that she sent Shanna Davis to Petitioner's room to have sex with him for money, which would not undermine what

Davis said that she saw.  Consequently, Petitioner has not shown that the trial court's

adjudication of this claim has "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."  § 2254(d)(1).

**Ground Seven**

Petitioner alleges that his attorney was ineffective for failing to file a timely motion

in limine to prohibit the introduction of evidence that he had sexually molested children

in the past, or to make a contemporaneous objection when such evidence was

presented.  Doc. 1, p. 6-E; p. 24 on ECF.  The "evidence" that he had sexually molested

other children was presented in the opening statement and in the direct examination of

Detective Pond.  In opening statement, the prosecutor told the jury that Detective Pond

would testify that he asked Petitioner "if there were any other victims and he said, 'No,

there are no others.' " Ex. B, p. 93.  On direct examination of Pond, as already noted

above, after Petitioner had twice nodded his head indicating that his grandson was

telling the truth, Pond asked if there were any other victims, and Petitioner said: "No

there is no others."  *Id.*, p. 168.

The trial court denied this claim without a hearing.  Ex. K, R. 210.  The court

found that the testimony was offered not to show that Petitioner had committed other

acts of sexual abuse of children, but "was simply part of the interrogation process and

offered to show that the Defendant had confessed to molesting his grandson."  *Id.*

Given the answer, the "obvious inference was that there was only one victim; the

Defendant's grandson."  *Id.*  The court concluded that the statement was probative of

Petitioner's guilt, and not offered to prove his prior behavior, and any objection that

might have been made by Petitioner's lawyer would have been overruled.  *Id.*  The court also found that the State did not err in mentioning this in opening statement.  *Id.*

The question and answer followed logically after Petitioner had admitted that his grandson told the truth.  The premise, that his grandson was a victim, was a fair predicate for the question, given the immediately preceding sequence of questions and head nods.  The answer was also a denial that Petitioner had molested any other children, which is not evidence that he had previously molested other children.  A violation of the federal constitution has not been alleged here, and there was no need for an evidentiary hearing.  Thus, Petitioner has not shown that the trial court's adjudication of ground seven has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Eight**

Petitioner argues that his attorney was ineffective because he failed to seek an expert to conduct a psychological examination to determine whether Petitioner exhibited sexual offender character traits.  Doc. 1, p. 6-G; p. 25 on ECF.  Petitioner contends that he does not have the traits associated with a sexual offender.  *Id.*

The trial court denied this claim without an evidentiary hearing.  The court noted that Petitioner had not alleged that such an expert exists who would have so testified.  Ex. K, R. 210.  The court also found that even if such evidence exists, it would have been inadmissible character evidence pursuant to FLA. STAT. § 90.404.  *Id.*

The first finding is sufficient to deny this claim.  Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir. 1985), *cert. denied*, 479 U.S. 918 (1986) (defendant's conclusory

allegations about the testimony of uncalled witnesses are insufficient to state a claim of ineffective assistance of counsel).  There is no evidence that such an expert exists, and even if there were, there is no evidence that Petitioner does not exhibit such "traits."  It is also too late for Petitioner to develop the facts in this court, having failed to do so in state court.  *See*, footnote 5, *supra*.  Petitioner has not shown that the trial court's adjudication of ground eight has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Nine**

Petitioner asserts that he was denied effective assistance of counsel because the trial court denied him the opportunity to confer with his attorney during recess, at the charging conference, at the close of the State's case in chief, or at any other period immediately before the defense's case-in-chief.  Doc. 1, p. 6-I; p. 27 on ECF.  Petitioner alleges that after the State rested, the trial court excluded evidence from Debra and Wallace Howard.  *Id.*; *see* footnote 9, *supra*.  Petitioner asserts that denial of the opportunity to call these two witnesses caused a "serious reconsideration of the defense strategy," and, since he and his attorney needed to confer, his attorney asked for a continuance.  *Id.*, *citing* Ex. B, R. 216-225.  The court denied the request for a continuance, conducted a charge conference, and the trial resumed thereafter with testimony from Petitioner.  *Id.*, pp. 6-I and 6-J.  Petitioner asserts that he needed time to talk with his lawyer about calling a DNA expert, Dr. Keefe, and Krysta Howard, and to "rethink" the defensive strategy.  Doc. 1, p. 6-J; p. 28 on ECF.

The trial court denied this claim without an evidentiary hearing.  Ex. K, R. 211. The court set forth what happened and held: "Since the record shows that trial counsel moved for a continuance, the issue of whether the Defendant was given adequate time to confer with counsel should have been raised on appeal."  *Id.*  GO TO DOC. 12, P. 24.

This claim is not a claim of ineffective assistance of counsel.  Petitioner does not allege anything that his attorney might have done differently to obtain a continuance. The claim is a claim of trial error in denial of a continuance.  A trial error claim had to be raised on direct appeal.  The trial court's ruling was an independent and adequate ruling finding that the claim was procedurally defaulted.  Petitioner has not shown cause for failing to raise the claim on direct appeal, or prejudice to the outcome.  Consequently, this court cannot reach the merits of ground nine.

**Ground Ten**

Petitioner contends that he was denied effective assistance of counsel due to the cumulative effect of counsel's errors.  There were no errors, and hence no error to accumulate, as the trial court found after an evidentiary hearing.  Ex. K, R. 365. Petitioner has not shown that the trial court's adjudication of ground ten has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Broughton Howard pursuant to 28 U.S.C. § 2254, challenging his conviction for capital sexual battery upon a person less than 12 years of age in the Circuit Court of the First Judicial Circuit, in and for Okaloosa County, Florida, case number 02-1545 CFA, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on November 20, 2008.


s/    William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**